IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ESTELA FIGUEROA DIAZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11 C 1087 |
| v. | ) | |
| | ) | Magistrate Judge |
| MICHAEL J. ASTRUE, | ) | Maria Valdez |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision

of the Commissioner of Social Security denying plaintiff Estela Figueroa Diaz's

claim for Supplemental Security Income Benefits. The parties have consented to

the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §

636(c). For the reasons that follow, Diaz's motion for summary judgment [Doc. No.

13] is granted, and the Court finds that this matter should be remanded to the

Commissioner for further proceedings.

## BACKGROUND

### I.    PROCEDURAL HISTORY

Diaz originally applied for Supplemental Security Income Benefits on

November 19, 2007, alleging disability since December 2, 2001. (R. 31-32, 39.) The

application was denied initially on February 21, 2008 and upon reconsideration on

May 20, 2008. (R. 39.) Diaz filed a timely request for a hearing by an

Administrative Law Judge ("ALJ"), which was held on March 25, 2009. (*Id.*) Diaz personally appeared and testified at the hearing and was represented by counsel. (R. 9.) A vocational expert also testified at the hearing. (*Id.*)

On May 28, 2009, the ALJ denied Diaz's claim for benefits and found her not disabled under the Social Security Act. (R. 48.) The Social Security Administration Appeals Council denied Diaz's request for review, (R. 1-3), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.     FACTUAL BACKGROUND

### A.     Background

Diaz was born on August 15, 1964. (R. 31.) Her past relevant work was as a housekeeper and in light construction. (R. 25, 512.) Diaz claims disability due to back pain and depression. (R. 31-32.) Diaz injured her back at work in 2000 and her left knee at around the same time. (R. 364-67, 420.) Diaz had knee surgery in 2001 and a disc arthroplasty August 2008. (R. 365, 417-19.) She first requested medication for depression in late 2006, and in In October 2007, she was hospitalized for suicidal thoughts and continued psychiatric care after her discharge. (R. 257, 281-310, 453-72.)

In her application, Diaz reported that she has difficulty carrying anything unless it is very light, and she has trouble bending down due to the pain in her lower back and her knees. (R. 152.) She is able to drive a car, but only for short

periods of time, and she has difficulty using public transportation because of the distance she needs to walk to the bus stop. (R. 153.) Diaz can walk about two blocks, which takes her about twenty minutes, and she can exercise for fifteen minutes on a treadmill. (R. 159, 164.) Diaz claimed that she can only sit for about forty-five minutes before she has to stand up; and then after the pain in her lower back starts, she has to sit or lay down. (R. 153.) She can cook for about twenty or thirty minutes, but she has to take breaks to ease her pain. (*Id.*) She prepares meals for herself that take only a few minutes, such as tuna salad, soup, sandwiches, cereal, or eggs. (R. 161.) She washes her own dishes, which takes her no more than three minutes after a meal. (*Id.*) Her parents help her take care of her son. (R. 160.) Diaz stated that her depression medication makes her tired, and she must sleep during the day. (R. 159.) Diaz is able to watch television and play cards, but she goes outside only one or two times a month. (R. 162-63.)

### B.    Testimony and Medical Evidence

#### 1.    *Diaz's Testimony*

Diaz testified that she lives with her parents and four-year old son. (R. 12.) She is five feet two or three inches tall, and had previously been thin but gained weight after her injury and weighed approximately 175 pounds at the time of the hearing. (*Id.*) She graduated high school in Mexico and can speak English, although she used an interpreter at the hearing. (R. 13.)

Diaz testified that she does not drive much and only drives short distances because she has pain after sitting for ten or fifteen minutes. (R. 14.) She stated that

she can stand for about twenty minutes and walk for twenty minutes if she walks slowly. (R. 15.) Diaz stated that she cannot bend over, only squat. (R. 18.) She can only cook quickly because she cannot stand up for very long, she cannot clean floors, and her mother washes the dishes. (R. 15.) She cannot carry a laundry basket but can put clothes into the washer and dryer. (*Id.*) She only grocery shops a nearby store; otherwise another member of her family must do it. (R. 16.) Diaz does not watch much television or read; she talks to her mother or sleeps during the day, because her medication makes her drowsy. (R. 16-17.) At night, she never sleeps more than three hours at a time due to pain. (R.23.)

As of the date of the hearing, Diaz was taking Ultram for pain and Cymbalta, Abilify, and Haldol for depression. (R. 21.) Her son reminds her to take her medicine. (R. 22.) She testified that her depression makes conversation difficult, and she gets very nervous when someone begins to argue about anything. (R. 19, 22.)

### 2. *Medical Evidence*

#### a. **Physical Impairments**

In March 2007, Diaz was first seen by Dr. George Miz for chronic low back pain. (R. 420.) On April 12, 2007, Dr. Miz noted that an MRI scan showed a degenerative disc bulge at L4-L5 with minimal loss of disc height and marked loss of disc height with severe degeneration of the L5-S1 disc. (R. 420, 425.) Dr. Miz recommended a discogram to determine whether or not L4-L5 is a competent pain generator; he noted the likelihood that L5-S1 has not improved since her previous

discogram six years earlier. (*Id.*) The discogram was performed on February 4, 2008, and was negative at L3-L4 but noted diffuse bulging at L5-S1. (R. 417, 423.) Diaz ultimately had a FlexiCore total disc arthroplasty L5-S1 on August 11, 2008. (R. 417.) Dr. Miz found that Diaz was doing well post-operatively, with moderate back pain and occasional intermittent right leg discomfort. (R. 418-19.) In October and November 2008, x-rays showed excellent alignment of her FlexiCore implant. (R. 419.) Diaz claimed to have limiting back pain, requiring her to take Ultram. (*Id.*) Dr. Miz reported on January 13, 2009 that Diaz's physical therapist stated that she was currently functioning at the light level with the potential for further improvement. (R. 416.)

A consultative examination was performed on January 26, 2008 by Dr. ChukwuEmeka Ezike. (R. 364-67.) Dr. Ezike examined Diaz and also reviewed her disability report and medical records from Silver Cross Hospital. (R. 364.) Diaz reported that she could walk two blocks, stand for about ten minutes, sit for about ten minutes at a time, and lift only about ten pounds. (R. 365.) She required assistance to clean her home, shop, and put on her shoes and pants. (*Id.*) Diaz stood up during the examination due to low back pain but was able to get on and off the exam table without difficulty and could walk more than fifty feet without support. (R. 365-66.) The range of motion of Diaz's cervical and lumbar spine was normal, and the straight leg raise test was negative bilaterally. (R. 366.) Lumbar flexion was 30° with mild pain, and extension was 15°. (*Id.*) Dr. Ezike concluded that Diaz

suffered from chronic low back pain, and chronic left knee pain post-surgery. (R. 367.)

### b.    Mental Impairments

In October 2007, Diaz went to Silver Cross Hospital, stating that she had suicidal thoughts over several days. (R. 284.) At the time, Diaz was taking fluoxetine, which did not really help her, as well as Lexapro, Haldol, and Vicodin. (R. 281, 284.) Diaz was diagnosed with schizoaffective disorder, depressed type. (R. 284.) Because she was no longer suicidal, she was discharged after four days and ordered to follow up at Will County Mental Health Center as an outpatient. (R. 281.) The discharge summary indicated that she was no longer suicidal, her affect was brighter, she was not a danger to herself, she had an improved outlook, and her mood had stabilized. (*Id.*)

A December 10, 2007 psychiatric evaluation completed by Dr. Navakas of the Will County Mental Health Department noted that Diaz had good activities of daily living, she was friendly and willing to talk, not agitated, and generally calm but anxious much of the time. (R. 472.) Diaz was diagnosed with major depressive disorder, recurrent with psychotic features, and the report noted she had a global assessment of functioning ("GAF") score of 45-50. (*Id.*) Diaz continued outpatient treatment on a regular basis through March 2009. (R. 454-72.)

Dr. Ezike's January 26, 2008 evaluation included a mental status examination, which revealed that Diaz was alert and oriented to place, time, and current date; her appearance, behavior, and ability to relate during the examination

were normal; and she was appropriate, polite, pleasant, and cooperative, with no

signs of agitation, irritability, or anxiety. (R. 366.) Diaz presented with a depressed

affect, and she cried during the evaluation. (*Id.*) Dr. Ezike concluded that Diaz

suffered from depression. (R. 367.)

A March 16, 2009 psychiatric report completed by Dr. Navakas noted that

Diaz has to care for herself but does not take care of others; her mother helps her

with her four year-old child; she does not do any house or yard work or shopping;

she rarely goes out; and meals are prepared for her by her mother. (R. 455.) Dr.

Navakas repeated his earlier diagnosis of major depression, recurrent with

psychotic features. (R. 458.) He opined that she would not be capable of performing

simple routine repetitive tasks with a normal amount of supervision, because she

feels unmotivated and depressed. (*Id.*) Dr. Navakas found the question of whether

she would be capable of socializing with co-workers in supervisory personnel to be

not applicable, because she was "not interested in socializing much these days." (*Id.*)

He also concluded that she could not achieve production requirements and tolerate

work pressures generally associated with unskilled work due to the two major

issues of depression and her physical health. (*Id.*) She could, however, be capable of

understanding, retaining, and carrying out simple instructions. (*Id.*) In response to

a supplemental questionnaire as to Diaz's residual functional capacity, Dr. Navakas

found a mild impairment of her ability to relate to other people; a moderately severe

degree of restriction of daily activities; a mild degree of deterioration in her

personal habits; a moderate degree of constriction of her interests; and a moderate

limitation in understanding, carrying out, and remembering instructions. (R. 459.)
Next to additional questions asking whether Diaz could respond appropriately to
supervision, to coworkers, and to customary work pressures, Dr. Navakas wrote in
question marks rather than circling the appropriate rating term. (*Id.*)

### 3. *Vocational Expert's Testimony*

The vocational expert testified that for a person of Diaz's age, education,
work experience, and skill set who is limited to unskilled light work with only basic
written communication, no interaction with the public, and only occasional
interaction with co-workers, there are 10,000 jobs in the region as a light cleaner;
1,500 jobs as a food product sorter; and 10,000 jobs as a cafeteria attendant. (R. 27.)
All of those occupations would be eliminated if the person needed a sit/stand option.
(*Id.*) A sit/stand option would limit the person to unskilled sedentary work, which in
the regional economy includes 3,500 jobs as an electric accessory assembler; 1,000
jobs as an optical worker; and 1,000 jobs as polishers. (R. 28-29.) A person who
needed to be away from her tasks for two hours a day due to side effects from
medication would be precluded from all employment. (R. 29.)

### C. ALJ Decision

The ALJ found that Diaz had not engaged in substantial gainful activity
since her November 19, 2007 application date. (R. 41.) The ALJ also found that Diaz
had severe impairments from degenerative disc disease and major depressive
disorder as well as a non-severe impairment of knee pain, which did not have more
than a minimal effect on Diaz's work-related activities. (R. 41-42.) The ALJ stated

that none of Diaz's impairments, alone or in combination, met or medically equaled any listing of impairments. (R. 42.)

The ALJ next determined that Diaz had the residual functional capacity ("RFC") to perform light work, with the following additional limitations: simple and routine work not requiring more than basic written communication, no interaction with the public, and only occasional interaction with co-workers. (R. 44.) These limitations precluded Diaz from performing her past relevant work of light construction labor and housekeeping. (R. 47.) Using the Medical-Vocational guidelines together with the testimony of the vocational expert and Diaz's RFC, age, and work experience, the ALJ concluded that there were significant numbers of jobs in the Chicago metropolitan area that Diaz could perform, such as light cleaner, food product sorter, and cafeteria attendant, and thus Dias was not disabled. (R. 48.)

## DISCUSSION

### I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment? (3) Does

the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its

judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

### III.    ANALYSIS

Diaz argues that the ALJ decision was in error because in determining her

RFC, the ALJ: (1) improperly analyzed Diaz's credibility; and (2) incorrectly

weighed the medical evidence.[1]

### A.    Credibility

According to Diaz, the ALJ erred in finding that her subjective claims of

impairment were not credible. An ALJ's credibility determination is granted

substantial deference by a reviewing court unless it is "patently wrong" and not

supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007);

*Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, an ALJ must give

specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must

be supported by record evidence and must be 'sufficiently specific to make clear to

the individual and to any subsequent reviewers the weight the adjudicator gave to

the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v.*

*Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-

88).

Moreover, the absence of objective medical evidence supporting the subjective

complaint is only one factor to be considered in the credibility determination.

*Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). The ALJ must also consider:

---

[1] Diaz also argues that the ALJ's RFC determination was conclusory and incorrect, but this argument is based on the RFC's failure to credit Diaz's own statements or Dr. Navakas's report. It is therefore unnecessary to consider this argument separately.

"(1) the claimant's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." *Id.*

The ALJ's credibility determination found that Diaz's impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 44-45.) This boilerplate credibility template has been roundly criticized by the Seventh Circuit, which has noted that although "the assessment of claimant's ability to work will often . . . depend heavily on the credibility of her statements concerning the 'intensity, persistence and limiting effects' of her symptoms," the template "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir,. 2012). The template is thus inconsistent with SSR 96-7p(4), which states that a claimant's statements about the intensity or persistence of symptoms cannot be disregarded solely because they are not substantiated by objective medical evidence. *Id.* at 646.

In this case, the specific reasons the ALJ found Diaz's complaints not to be credible are difficult to discern. However, the credibility determination was immediately followed by a list of medical reports and findings, followed by the statement "[i]n sum, the above residual functional capacity assessment is supported by the clinical and objective medical evidence of record," (R. 46), which strongly

13

indicates that the ALJ relied primarily on the medical evidence in finding Diaz not credible.

Diaz claims that the ALJ's recitation of the record was misleading because it disregarded the difficulty Diaz has in performing her activities of daily living and wrongly concluded that her ability to perform those activities translated to an ability to work. The Court agrees that the ALJ's brief consideration of Diaz's daily activities is incomplete. The ALJ maintained that Diaz's activities of daily living "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations," noting that Diaz "can prepare meals, exercise, manage personal hygiene, drive a motor vehicle, wash dishes, pay her own bills, play cards and board games and care for her child." (R. 46.) The ALJ, however, did not explain why those activities are inconsistent with Diaz's subjective complaints or how they demonstrate an ability to work. Significantly, it is not clear whether the ALJ's credibility determination took into account the stated difficulty Diaz has in performing those activities or how long she can perform them. For example, Diaz's preparation of meals generally consists of reheating food made by her mother or assembling very quick meals for herself, such as a sandwich. She can drive, but for very short distances. She washes dishes, but only her own dishes, for no more than three minutes. She cares for her child, but with the help of her parents. On remand, the ALJ's credibility finding must not be conclusory but must instead draw a logical conclusion based upon all of the relevant evidence as applied to the factors enunciated in SSRs and case law.

### B.    Medical Evidence

Diaz next faults the ALJ for failing to consider the report of her treating psychiatrist, Dr. Navakas, who in a March 10, 2009 report diagnosed Diaz with major depression, recurrent, with severe psychotic features. (R. 458.) He opined that while Diaz was capable of understanding, retaining, and carrying out simple instructions, she would not be capable of performing simple routing repetitive tasks with a normal amount of supervision because she is unmotivated and depressed. (*Id.*) He answered a question as to whether she would be able to socialize with co-workers and supervisors as "not applicable," because Diaz was "not interested in socializing much these days." (*Id.*) Dr. Navakas concluded that Diaz could not achieve production requirements and tolerate work pressures generally associated with unskilled work because of her depression and physical health issues. (*Id.*)

There is no dispute that Dr. Navakas was Diaz's treating physician; she received outpatient psychiatric treatment at the Will County Health department from October 2007 through September 2010. (R. 453-72.) Accordingly, his opinion is to be given "controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record. . . . An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (citations omitted). Furthermore, even if the decision included "sound reasons for refusing to give [Dr. Navakas's] assessment controlling weight, the ALJ still would have been required to determine what value the assessment did merit." *Id.* (explaining that if a treating physician's opinion is not given controlling

15

weight, the regulations require consideration of "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion").

The ALJ summarily found Dr. Navakas's report "less persuasive" because it "contrasts sharply with the other evidence of record."[2] (R. 46.) However, the ALJ did not list what medical evidence contradicts Dr. Navakas's findings, so the Court is left to speculate about which of the various reports described throughout the decision are relevant to her conclusion. The ALJ cites evidence that after she was discharged following her hospitalization for suicidal thoughts in October 2007, "her affect was reported as brighter, her mood stabilized and she was no longer a danger to herself." (*Id.*) A December 10, 2007 psychiatric evaluation report confirmed Diaz's diagnosis of a major depressive disorder, recurrent with psychotic features but "revealed good activities of daily living, friendly attitude, and normal motor behavior," along with good insight and judgment. (*Id.*) However, neither of these reports purported to assess Diaz's fitness to work. Moreover, the ALJ's citation of the December 10, 2007 report as evidence that Diaz's symptoms are not debilitating

---

[2] In addition, the ALJ emphasized that while Dr. Navakas's report concluded that Diaz was precluded from performing even simple work, "in the same report the doctor noted the claimant would be able to understand, retain and carry out simple instructions." (R. 46.) First, this statement appears to imply that the ability to carry out simple instructions necessarily equates to an ability to work. Second, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

disregarded her earlier notation that the same report cited a global assessment functional ("GAF") score of 45-50, "which indicated that the claimant had serious symptoms or a serious impairment in social occupational, or school functioning." (R. 45.)

The January 26, 2008 consultative examination was not performed by a mental health professional and considered Diaz's mental fitness only secondarily to her physical assessment. In his brief, the Commissioner also points to a February 2008 report by a state agency reviewing physician describing only mild and moderate mental limitations. This report, however, was not discussed by the ALJ at all. The ALJ's decision thus does not meet its burden of establishing that the report of Diaz's treating physician should be given no weight.

**CONCLUSION**

For the foregoing reasons, Plaintiff Estela Figueroa Diaz's motion for summary judgment [Doc. No. 137] is granted. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this order.

**SO ORDERED.**                    **ENTERED:**


**DATE:   April 18, 2012**          _____
                                    **HON. MARIA VALDEZ**
                                    **United States Magistrate Judge**